Patricia Lamalfa v. Janis Hearn et al., No. 39, September Term, 2017

**EXPERT WITNESS TESTIMONY – BASES OF OPINION TESTIMONY BY EXPERT – MARYLAND RULE 5-703 – FACTS OR DATA REASONABLY RELIED UPON BY TESTIFYING EXPERT – DISCLOSURE TO JURY – ELEMENTS FOR DISCLOSURE –** Court of Appeals held that trial court did not abuse its discretion or err in "admitting" plaintiff's post-accident medical treatment records into evidence under Maryland Rule 5-703. Court of Appeals concluded that "disclosed" under Maryland Rule 5-703(b) means that evidence is admissible if it satisfies four elements set forth in Maryland Rule 5-703(b), and that such evidence may, in trial court's discretion, be disclosed to jury to explain factual bases for expert's opinion. Under circumstances of case, medical records satisfied four elements of Maryland Rule 5-703(b) because they were trustworthy, unprivileged, reasonably relied upon by defense expert in forming his opinions, and necessary to illuminate defense expert's testimony. Court of Appeals also concluded that, even if disclosure, *i.e.*, admission, of medical records under Maryland Rule 5-703 was error, such error was harmless, as plaintiff failed to demonstrate that she was prejudiced by admission of medical records or their use at trial; record contains no indication that jury placed undue weight on medical records.

Circuit Court for Baltimore City
Case No. 24-C-14-005520

Argued: December 4, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 39

September Term, 2017

_____

PATRICIA LAMALFA

v.

JANIS HEARN ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Watts, J.

_____

Filed: February 2, 2018

In Maryland, it is well established that "[a]n expert may give an opinion based on facts contained in reports, studies, or statements from third parties, if the underlying material is shown to be of the type reasonably relied upon by experts in the field." U.S. Gypsum Co. v. Mayor and City Council of Balt., 336 Md. 145, 176, 647 A.2d 405, 420 (1994) (citations omitted). This Court has stated that "the underlying reports, data, or statements themselves may be admitted into evidence for the purpose of explaining the basis of the expert's opinion." Id. at 176, 647 A.2d at 420 (citations omitted). This process is formalized under Maryland Rule 5-703(b), which provides, in pertinent part, that, "[i]f determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert pursuant to section (a) may, in the discretion of the court, be disclosed to the jury even if those facts and data are not admissible in evidence." In Brown v. Daniel Realty Co., 409 Md. 565, 601, 976 A.2d 300, 321 (2009), this Court explained that, from Maryland Rule 5-703(b), we distilled "four elements [that] must be satisfied for a document to be admissible under [Maryland R]ule[ 5-703]. The document must be (1) trustworthy, (2) unprivileged, (3) reasonably relied upon by an expert in forming her or his opinion, and (4) necessary to illuminate that expert's testimony."

This case concerns admission, under Maryland Rule 5-703(b), of medical records of the plaintiff that a defense expert relied upon in forming his opinions. Specifically, in the Circuit Court for Baltimore City ("the circuit court"), Patricia Lamalfa, Petitioner, sued Janis Hearn, Respondent, for negligence related to a motor vehicle accident. At a jury trial, during Respondent's medical expert's testimony, the circuit court admitted into evidence, over Petitioner's objection, four of Petitioner's post-accident medical treatment records

that the expert relied upon in forming his opinions. At the close of all of the evidence, the circuit court granted a motion for judgment in Petitioner's favor on negligence, and ruled that the jury would determine "the amount of damages, if any[,] that should be awarded." Petitioner requested that the jury enter a verdict for economic and non-economic damages in an amount from $50,000 to $150,000, including damages for emotional distress. The jury returned a verdict in Petitioner's favor in the amount of $10,576.05, which included the full amount of Petitioner's medical bills in the amount of $9,926.05, plus $650.00 for non-economic damages. Consistent with the jury's award, the circuit court entered judgment in Petitioner's favor and against Respondent in the amount of $10,576.05. Petitioner appealed, and the Court of Special Appeals affirmed the circuit court's judgment. Petitioner filed in this Court a petition for a writ of *certiorari*, which we granted.

Against this backdrop, we consider whether the circuit court properly admitted four medical records into evidence under Maryland Rule 5-703, and, specifically, whether "disclosed" under Maryland Rule 5-703(b) means "admitted." We hold that the circuit court did not abuse its discretion or err in admitting Petitioner's post-accident medical treatment records into evidence under Maryland Rule 5-703. Specifically, we conclude that "disclosure" means that evidence is admissible under Maryland Rule 5-703(b) where the evidence satisfies the four elements set forth in Maryland Rule 5-703(b), and that such evidence may, in a trial court's discretion, be disclosed to the jury to explain the factual bases for an expert's opinion. Additionally, under the circumstances of this case, the medical records satisfied the four elements of Maryland Rule 5-703(b) because they were trustworthy, unprivileged, reasonably relied upon by the defense expert in forming his

- 2 -

opinions, and necessary to illuminate the defense expert's testimony. And, we conclude that, even if disclosure, *i.e.*, admission, of the medical records under Maryland Rule 5-703 was error, such error was harmless as Petitioner has failed to demonstrate that she was prejudiced by admission of the medical records or their use at trial; the record contains no indication that the jury placed undue weight on the medical records.

## BACKGROUND

On October 14, 2011, Petitioner, a resident of Brooklyn, New York, was in Maryland to attend a family member's wedding. On the way to the wedding, Petitioner was sitting in the rear passenger seat of a small SUV that was being driven by her son, Steven Lamalfa ("Steven"). Steven drove the SUV southbound on Interstate 95 and onto an exit ramp, where it came to a complete stop. While stopped, the SUV was rear-ended by a vehicle that was being driven by Respondent.

Emergency medical technicians responded to the scene, but Petitioner did not seek medical treatment at that time. Petitioner, Steven, and the other occupants of the SUV— Steven's girlfriend, Gina Illardo; Petitioner's friend, Brigitte Rivera ("Rivera"); and Steven's infant daughter—eventually left the scene of the accident and attended the wedding. After the wedding, Petitioner and the SUV's other occupants went to a hotel for the night. The next morning, Petitioner went to the emergency room at Mercy Medical Center ("Mercy") in Baltimore City complaining of lower back pain and some pain in her left forearm. Petitioner was treated at Mercy, released that same day, and returned to New York that night.

On October 21, 2011, a week after the accident, Petitioner sought medical treatment

- 3 -

from Yury Koyen, M.D., of Relief Medical, P.C. in Brooklyn, New York, who specializes in physical medicine and rehabilitation. At that time, Petitioner complained of upper and lower back pain, pain in both arms, pain in her left hip, periodic numbness in her right hand, pain in her right shoulder, weakness in her left arm, tailbone pain that was worsened by sitting, and emotional distress related to the accident, including flashbacks, fear of sitting in a car, and claustrophobia. Dr. Koyen recommended that Petitioner undergo physical therapy and chiropractic treatment, as well as diagnostic testing in the form of MRIs and X-rays.

In October of 2011, Petitioner also started experiencing severe abdominal pain; however, a CT scan of Petitioner's abdomen and pelvis performed on October 31, 2011, was normal. Later, on March 7, 2012, Sampath Kumar, M.D., performed surgery on Petitioner to repair an epigastric hernia. Apparently, the epigastric hernia was a recurrent issue for Petitioner, who had surgery to repair an epigastric hernia in 1984.

In the meantime, on November 7, 2011, Petitioner had an MRI of her right shoulder performed, which revealed a rotator cuff injury. In December 2014, over three years later, Petitioner visited Jaspreet Sekhon, M.D., who ordered another MRI, which revealed a rotator cuff tear. Thereafter, Petitioner underwent arthroscopic surgery on her right shoulder.

On September 23, 2014, Petitioner filed in the circuit court a complaint against

Respondent, alleging negligence.[1]   Specifically, Petitioner alleged that Respondent negligently operated her motor vehicle and caused Petitioner's injuries.  Petitioner sought damages in excess of $75,000.  From February 16 to 18, 2016, the case was tried before a jury.  At trial, as part of the plaintiffs' case, Petitioner and Steven testified,[2] and videotaped *de bene esse* depositions of Dr. Koyen, Dr. Kumar, and Dr. Sekhon were played for the jury.[3]

Petitioner, who was fifty-four years old at the time of trial, testified that she worked as a hairdresser from the age of eighteen until approximately within a year of the accident, and that she did not have difficulties performing her job or otherwise have problems with her right shoulder prior to the accident.  Petitioner acknowledged, however, that, in 1984, she had hernia repair surgery.  As to the accident on October 14, 2011, Petitioner testified that, when the SUV in which she was a passenger was rear-ended, she "was thrust forward, sideways[,]" she hit her head, and she recalled her "shoulder or something hitting [her

---

[1]In the complaint, Steven and Rivera were also named as plaintiffs.  Rivera settled her claims before trial.  Steven's claims were tried with Petitioner's.  The jury returned a verdict in Steven's favor, and the circuit court entered judgment in his favor, in the amount of $8,575.66.  Steven did not appeal, and he is not a party in this Court.

Additionally, the plaintiffs originally included John B. Hearn, Jr. ("John"), Respondent's husband, as a defendant, suing him for negligence and negligent entrustment; on the first day of trial, however, those claims were dismissed with prejudice.  John is not a party in this Court.

[2]Because Steven's testimony is not relevant to the issue in this case, we do not summarize his testimony.

[3]As the Court of Special Appeals noted in its reported opinion in this case, "[t]he video depositions were not transcribed and the DVD recordings are not in the record." Lamalfa v. Hearn, 233 Md. App. 141, 144 n.4, 163 A.3d 205, 207 n.4 (2017).  Thus, as the Court of Special Appeals did, "we summarize the expert testimony based only upon the excerpts provided by [Respondent] in the appendix to her brief." Id. at 144 n.4, 163 A.3d at 207 n.4.

right] shoulder or grabbing [her] shoulder and [her] left knee." Petitioner testified that, the evening of the accident, she began experiencing pain in her lower back and her left knee, and she went to Mercy the next morning. As to her abdomen, Petitioner testified that, after the accident, "[i]t started feeling weak[,]" she noticed she could not "move things or pick things up[,]" and "then [she] started feeling a protrusion." According to Petitioner, as a result of the protrusion and upon "realiz[ing] what it could be[,]" she went to see Dr. Kumar, who performed surgery to repair a hernia. Petitioner testified that, between the accident and when she first started noticing problems with her abdomen, she had not experienced any other traumatic event to her stomach or abdominal area.

As to her right shoulder, Petitioner testified that after the accident she began experiencing right shoulder pain that "got progressively worse." According to Petitioner, she was unable to pick up her grandchildren, lift pots and pans, or stretch too high because her right shoulder pained her and would "lock in place." Petitioner testified that she did not seek immediate medical treatment for her right shoulder because she had moved in with her parents, and her mother was already providing care to her stepfather, who had undergone full knee replacement surgery. Petitioner testified that, in December 2014, she visited Dr. Sekhon, who recommended surgery for her right shoulder. Petitioner testified that she underwent arthroscopic surgery on her right shoulder, and that recovery following the surgery was "[l]ong and arduous." According to Petitioner, for approximately twelve or thirteen weeks after surgery, she had to wear a sling with a bolster on her arm at all times, except when bathing. Petitioner testified that, while wearing the sling and bolster, "[s]leeping was horrendous and still is." And, Petitioner testified that her right shoulder

- 6 -

was "still impaired[,]" that she could not "lift it past a certain level[,]" and that she could not "bear any weight on it."

On Petitioner's behalf, Dr. Koyen testified by video deposition that, to a reasonable degree of medical certainty, among other things, Petitioner's hernia and the rotator cuff tear to her right shoulder were caused by the October 14, 2011 accident. Dr. Koyen opined that the rotator cuff tear to Petitioner's right shoulder, as seen on the MRI of November 7, 2011, was consistent with a traumatic event, and is a common injury following a motor vehicle accident. Dr. Koyen acknowledged that the records from Petitioner's visit to the Mercy emergency room from October 15, 2011 ("the Mercy record") did not include any mention of complaints of right shoulder pain or abdominal pain. Dr. Koyen testified that, on November 22, 2011, he prepared a report of his treatment of Petitioner, covering the period from October 21, 2011, the date of his first examination of Petitioner, to the date of the report ("the Koyen record"). Dr. Koyen acknowledged that, during Petitioner's initial visit on October 21, 2011, she did not complain of abdominal pain. Dr. Koyen testified, however, that, in his report, he noted that Petitioner complained of "severe pains in [her] abdominal and pelvic area[,]" and, as a result, a CT scan of Petitioner's abdomen was performed on October 31, 2011. Dr. Koyen acknowledged that the CT scan of Petitioner's abdomen was normal.

Dr. Kumar testified by video deposition that he performed surgery for a recurrence of an epigastric hernia. Dr. Kumar testified that, on March 19, 2012, after the surgery to repair the hernia, he saw Petitioner for a routine follow-up appointment, that she was healing well, and that he did not see her again after that visit. Dr. Kumar testified that, to

a reasonable degree of medical certainty, Petitioner's epigastric hernia was caused by the accident, and, specifically, the pressure of the seat belt against Petitioner's abdominal wall during the accident. When asked whether, to a reasonable degree of medical certainty, the circumstance that Petitioner had previously had an epigastric hernia repaired made her more susceptible to another hernia occurring during the accident, Dr. Kumar testified: "It's hard to tell. Well, because of when I did the surgery, . . . the previous repair was good. So I believe this is the result of the accident because of the impact, rather than weak tissue."

Dr. Sekhon testified by video deposition that, several years after the accident, he examined Petitioner and ordered an MRI of her right shoulder, which revealed a rotator cuff tear. On cross-examination, Dr. Sekhon acknowledged that he was seeing certain medical reports for the first time at deposition—specifically, the 2011 MRI, the Mercy record, and the Koyen record. Dr. Sekhon also conceded that he did not have any of Petitioner's medical records preceding the accident to determine if she had injuries or pain to her right shoulder before the accident.

Respondent's case consisted of her testimony and the testimony of Louis Halikman, M.D., an orthopedic surgeon. The circuit court accepted Dr. Halikman as an expert in orthopedic surgery, and ruled that Dr. Halikman would be permitted to testify "as a physician" as to other matters, but would not be permitted to offer an opinion outside of the field of orthopedic surgery. Dr. Halikman testified that, on December 28, 2015, at Respondent's counsel's request, he examined Petitioner. During his examination, Dr. Halikman noted that Petitioner is left-handed, and that her upper arms each measured the same circumference. According to Dr. Halikman, these observations were important

because he would have expected Petitioner's right arm to have been substantially smaller in girth than the left, given that her right arm was not her dominant arm and that she had recently had surgery on her right shoulder. Dr. Halikman testified that "[t]he fact that her muscle bulk is the same on both sides [told him] that she is probably using both of her arms in as close to natural fashion as possible."

Dr. Halikman testified that, in addition to taking Petitioner's medical history and examining Petitioner, he reviewed and relied upon four of Petitioner's post-accident medical treatment records in formulating his opinions as to Petitioner's injuries. Specifically, Dr. Halikman testified that he relied upon the following four medical records: (1) the Mercy record, marked as Defense Exhibit 2; (2) the Koyen record, marked as Defense Exhibit 3; (3) an "Initial Chiropractic Examination" report prepared on October 25, 2011, by an unidentified chiropractor ("the Chiropractic record"), marked as Defense Exhibit 4; and (4) an "Initial Consultation" report dated December 13, 2011, by Aleksandr Levin, M.D., of Diagnostic Medicine, P.C. ("the Levin record"), marked as Defense Exhibit 5.

Respondent's counsel offered the Mercy record into evidence and Petitioner's counsel objected "to the document coming in[.]" At a bench conference, Petitioner's counsel explained:

> Your Honor, I would object to the document coming in. The expert can certainly testify to it and obviously all his testimony is evidence in the case. However, the document itself is a hearsay document. It contains hearsay statements. It contains expert findings, opinions, and it contains secondary and probably even tertiary hearsay statements. . . . I would also, Your Honor, argue that in permitting some records in and not others also is far more prejudic[ial] than probative in that it's going to allow certain documents to

go back to the jury room without the benefit of having all of the documents. So on all of those grounds, Your Honor, I would object.

Respondent's counsel responded that Petitioner "had the opportunity to put in any documents that he wanted to and chose not to do it. It is a document that [Dr. Halikman] relied on in forming his opinion. And I believe it is, you know, allows it to come into evidence." Respondent's counsel urged that the Mercy record "should come into evidence." Immediately thereafter, the circuit court stated: "Objection's overruled. So admitted. It's being relied on by this expert in his review and opinion." The circuit court reiterated: "Objection is noted. However, Court overrules the objection and allows its admission. As the witness testified that he reviewed this and relied on it in reaching his opinion." Thus, the Mercy record was admitted into evidence.

Respondent's counsel offered into evidence the other three medical records that Dr. Halikman relied upon in forming his opinion—*i.e.*, the Koyen record, the Chiropractic record, and the Levin record. Petitioner's counsel made the "[s]ame objection" as to admission of those medical records, and the circuit court overruled the objections and admitted the medical records into evidence.

The Mercy record, dated October 15, 2011, consisted of sixteen pages, including a page containing a section labeled "History of Present Illness," that stated that Petitioner had been "involved in a rear-ended motor vehicle crash" the day before. That section noted that Petitioner "immediately, upon impact, reached over to the left side of the car to secure [her granddaughter's] car seat[,]" and that Petitioner "did not experience any immediate back pain[.]" The section stated that, over the course of the afternoon and evening

following the accident, Petitioner began to experience "the onset of left-sided lower back pain[,]" and, at the time of her visit to Mercy, was complaining of left-sided lower back pain and "of a much lighter pain in the left forearm." In a section labeled "Physical Examination: General," the Mercy record noted that Petitioner "ambulate[d] . . . with a slight limp but not much difficulty[,]" and that Petitioner "appear[ed] in no acute distress." The "Physical Examination: General" section stated that Petitioner's abdomen was "[s]oft[,]" and that there was "positive straight leg raising, [but that] she ha[d] difficulty with the lateral oblique motion on the left side." As to Petitioner's extremities, the Mercy record reported that Petitioner had "full range of motion of all joints." The Mercy record stated that the treatment plan for Petitioner included discharge with instructions to rest, to apply heat to affected areas, and to take over-the-counter pain medication as needed. The discharge summary stated that Petitioner should follow up with her doctor if her symptoms did not begin to improve after a week.

The Koyen record, prepared on November 22, 2011, consisted of five pages. In the Koyen record, Dr. Koyen stated that he first examined Petitioner on October 21, 2011, one week after the accident, and that Petitioner reported "sustain[ing] injuries to the head, left shoulder[,] and coccyx[, *i.e.*, tailbone]." In a section labeled "Chief Complaints," Dr. Koyen observed as follows:

> The patient complains of the flashbacks of the accident; neck pains radiating to the right arm and upper back, and to the left arm and forearm; low back pains; left hip pains; periodical numbness in the right hand; right shoulder pains; weakness in the left arm; fear of sitting in a car; coccyx pains worsened by sitting; claustrophobia after accident.

In a "Review of Systems" section, Dr. Koyen noted: "Patient admits to sharp neck pains

- 11 -

radiating to the left upper extremity and associated with numbness; sharp lumbosacral pains [that are] provoked by sitting." As to Petitioner's generalized appearance during the physical examination, Dr. Koyen observed that Petitioner was "in acute pain distress[,]" and was experiencing pain getting on and off the examination table. As to the physical examination of Petitioner's shoulders, Dr. Koyen noted, in relevant part, "[r]ight rotator cuff area tenderness[,]" that the "[r]ight shoulder's joint showed tenderness[,]" and that "[s]houlders' motion is painful bilaterally, right more than left." Dr. Koyen observed that Petitioner was "[p]ositive" on tests for nerve impingement of her right shoulder. Dr. Koyen's physical examination showed "[n]o remarkable tenderness" in Petitioner's chest or abdomen.

In a section labeled "Recommendations," Dr. Koyen recommended, in relevant part, that Petitioner: begin physical therapy three to four times per week for her right shoulder, among other areas; continue to take Aleve; consider undergoing an MRI of her right shoulder if problems persisted; and have an X-ray of her right shoulder. In a section labeled "Treatment," Dr. Koyen detailed the treatments, tests, and procedures that Petitioner had undergone following her initial appointment and the results. Dr. Koyen reported that, "[b]ecause of severe pains in the abdominal and pelvis area, CT scan of the abdomen/pelvis was performed and showed no acute inflammatory processes[.]" Additionally, Dr. Koyen stated that, "[b]ecause of severe pains in the right shoulder, MRI of the right shoulder was performed and revealed possible impingement of the supraspinatus muscle and rotator cuff intrasubstance tear involving supraspinatus and infraspinatus tendons." Dr. Koyen diagnosed Petitioner with, among other things, "[r]ight shoulder trauma with rotator

- 12 -

cuff tear and impingement" and "[a]bdominal trauma."

The Chiropractic record, consisting of five pages, was completed by an unidentified chiropractor on October 25, 2011, the date that Petitioner was examined. The Chiropractic record contained handwritten notations describing the reasons for Petitioner's visit, Petitioner's past medical history, and Petitioner's then-present complaints. In the "Present Complaints" section, the chiropractor circled "Neck Pain & Stiffness Left/Right" that "Radiates" to the "Left . . . Shoulder[,]" right shoulder pain, and left arm pain with "Numbness & Tingling Down to . . . Forearm[.]" The section labeled "Orthopedic & Neurologic Tests" showed that the chiropractor did not perform a "Shoulder Depression Test" used to detect "the presence of adhesions or injury to the soft tissues of the cervical spine[,]" or three other shoulder tests used to detect "impingement, tears or pathology[.]" In the "Diagnosis" section, the chiropractor circled diagnostic codes and diagnosed Petitioner with thoracolumbar radiculopathy, lumbar, thoracic, and cervico-thoracic joint dysfunction, a whiplash injury, headaches, and spinal subluxation. The chiropractor did not circle the diagnostic codes for shoulder injury or shoulder pain.

The Levin record, dated December 13, 2011, consisted of three pages, and was titled an "Initial Consultation" and was addressed to Dr. Koyen. Dr. Levin reported that Petitioner complained "of right shoulder pain, lower back pain radiating to the left leg, left knee pain, and weakness in the left leg." In the section labeled "Physical Examination," Dr. Levin noted that Petitioner was "in no acute distress[,]" that her abdomen was "[s]oft, not distended, no tenderness[,]" and that an examination of Petitioner's shoulders and upper extremities revealed "[n]o tenderness on palpation or decreased range of motion of

- 13 -

both shoulders, elbows, wrists, and hands." Dr. Levin observed, however, "tenderness" of the lumbar spine. Dr. Levin recorded his "Initial Impressions" as follows: "1. Post-traumatic lumbosacral sprain/strain[ and] 2. Rule-out lumbar radiculitis." (Paragraph break omitted). Dr. Levin recommended "EMG/NCV tests of the lower extremities with paraspinal muscles in order to rule-out possible lumbar radiculopathy, entrapment neuropathy, [and] polyneuropathy." In a section labeled "Plan," Dr. Levin recommended "[s]oft tissue mobilization/ spine manipulation[,]" and that Petitioner consult her primary care provider and "[a]void heavy lifting, carrying, excessive bending, prolonged sitting or standing."

Based on his review of these medical records and his examination of Petitioner, Dr. Halikman opined, to a reasonable degree of medical certainty, that Petitioner "did not sustain an injury to her right shoulder as a result of th[e] accident." Dr. Halikman explained:

> First of all, as I mentioned, there is no immediate complaint of pain. If you injured your shoulder you don't need someone to tell you that it is injured. You would know it, you would be pointing it out to someone you were seeing. Also, when we look at the results of the imaging studies, there was - - the shoulder problem was clearly degenerative and it progressed over a period of time which is what you would expect. Degenerative conditions by their very nature progress over a period of time.
>
> In addition, [Petitioner]'s occupation as a hairdresser is one of a number of different occupations that predispose patients to shoulder problems. . . . [H]airdressers, . . . anybody who works with their arms in elevated positions develop . . . impingement. And that is the rotator cuff rubbing underneath the top of the shoulder. . . . The presentation that she had, in my opinion, was typical for a person who had worked as a hairdresser for many, many years.

Additionally, Dr. Halikman opined that the MRI of Petitioner's right shoulder from

- 14 -

November of 2011 showed degeneration, and not an acute injury. Dr. Halikman testified that, if a rotator cuff tear had occurred at the time of the accident, he would have expected Petitioner "to have had treatment, injections, physical therapy and so forth and so on[,]" but that none of those things occurred. Dr. Halikman testified that a patient who experiences an acute tear to the rotator cuff would "have immediate acute pain and [] usually cannot lift the arm up. You can't miss it." Dr. Halikman noted that no such findings were present at the time that Petitioner visited the emergency room at Mercy, and that, "[i]n fact, there's no mention at all of any complaints referable to the shoulder."

According to Dr. Halikman, Petitioner's medical records showed that Petitioner did not initially complain of abdominal pain, and that both Dr. Koyen and Dr. Levin reported that Petitioner's abdomen was normal. Dr. Halikman opined that, when the Levin record was prepared on December 13, 2011, almost two months after the accident, "it would be reasonable to conclude that if a patient had a problem referable to those areas, it would have been evident by th[en], but it was not."

After Respondent rested, Petitioner's counsel moved for judgment "on the issues of contributory negligence and negligence as a matter of law[.]" In response, Respondent's counsel stated that she knew of "no reason" why the circuit court should not grant the motion because, "[l]ike [she] said in the beginning, . . . it's a rear-ender." The circuit court granted the motion for judgment in Petitioner's favor, ruling: "[T]he [c]ourt grants [the] motion and directs a verdict as to negligence of [Respondent] is established in this case, and that there is no contributory negligence on the part of [Petitioner or Steven]." The circuit court noted that the remaining issue in the case was "the matter of damages[.]" As

to the issue of damages, Respondent's counsel moved for judgment, and the circuit court denied the motion. The circuit court ruled that, "under the circumstances, it's a factual dispute to be sent to the jury for its determination as to the amount of damages, if any that should be awarded." Thereafter, the circuit court instructed the jury, and counsel made closing arguments.

During closing argument, Petitioner's counsel argued that both Petitioner's recurrence of an epigastric hernia and the rotator cuff tear to her right shoulder resulted from the accident. Petitioner's counsel asked the jury to award Petitioner all of her past medical expenses totaling $9,926.05 and non-economic damages in an amount from $50,000 to $150,000.

Respondent's counsel argued that the evidence did not show that the accident caused Petitioner's hernia and right shoulder rotator cuff tear. Respondent's counsel mentioned the four medical records admitted into evidence, and argued that: (1) Petitioner did not complain of right shoulder pain or abdominal pain during her visit to the emergency room at Mercy on October 15, 2011, the day after the accident; (2) Petitioner did not complain of abdominal pain during her initial visit to Dr. Koyen on October 21, 2011, a week after the accident, although she mentioned right shoulder pain; (3) although Petitioner complained of right shoulder pain during her chiropractic visit on October 25, 2011, there was no mention of an abdomen complaint, and no diagnosis of a shoulder injury; and (4) Petitioner's right shoulder was not tender, and had full range of motion, and Petitioner's abdomen was soft, but not tender, during her visit to Dr. Levin on December 13, 2011. Respondent's counsel argued that the evidence did not support finding that the two

surgeries Petitioner underwent—to repair the hernia and her right shoulder—were causally related to the accident, and that, accordingly, the evidence did not support an award for non-economic damages in the amount that Petitioner requested.

The circuit court provided a special verdict sheet to the jury, which deliberated on the issue of damages. Question 1 on the special verdict sheet asked "[w]hat measure of damages, if any, do you find the Plaintiff, Patricia Lamalfa, is entitled?" That question was followed by blank lines for "Past Medical Expenses," "Non-Economic Damages (Pain, Suffering, Physical Impairment, etc.)," and for total damages. The jury returned a verdict in Petitioner's favor, and awarded Petitioner all of her past medical expenses totaling $9,926.05, as well as non-economic damages totaling $650.00, for a total award of $10,576.05. Consistent with the jury's award, on February 25, 2016, the circuit court entered judgment in Petitioner's favor against Respondent in the amount of $10,576.05.

Petitioner noted an appeal, contending that the circuit court erred in admitting the four medical records into evidence. On June 28, 2017, in a reported opinion, the Court of Special Appeals affirmed the circuit court's judgment and held that the circuit court did not abuse its discretion in admitting the medical records into evidence under Maryland Rule 5-703. See Lamalfa v. Hearn, 233 Md. App. 141, 155, 163 A.3d 205, 213 (2017). The Court of Special Appeals concluded that the medical records satisfied the requirements for disclosure under Maryland Rule 5-703(b) because the medical records were not privileged, were reasonably relied upon by Dr. Halikman, were sufficiently trustworthy, and were necessary to aid the jury in understanding Dr. Halikman's opinion. See id. at 153-54, 163 A.3d at 212. The Court of Special Appeals explained, in pertinent part, as

- 17 -

follows:

> There is no significant difference between disclosure and admission of a writing under [Maryland] Rule 5-703 because to be able to use the writing to assess the credit, if any, to be accorded the opinion of the expert witness who relied upon it, the fact finder must be able to read the document, not just glance at it in passing. What *is* significant is that the writing is not to be used substantively (unless otherwise admissible for its substance). It is for that reason that the rule directs that, "upon request, the court shall instruct the jury to use the facts and data relied upon by the testifying expert only for the purpose of evaluating the validity and probative value of the expert's opinion or inference." Md. Rule 5-703(b).

> Here, the essence of [Petitioner]'s complaint is that the jurors could have misused the contents of the medical reports because the reports were with them in the jury room during deliberations. Any problem with how the jurors might have used the reports was not a function of their being in the jury room but of [Petitioner]'s failure to request a limiting instruction under [Maryland] Rule 5-703(b) either upon their admission, at the close of the evidence, or during defense counsel's closing argument. Had she done so, the court would have been required to instruct the jurors not to use the medical reports substantively—the very concern she now raises on appeal. Thus, her failure to request a limiting instruction is a waiver of this issue on appeal.

Lamalfa, 233 Md. App. at 155, 163 A.3d at 213 (emphasis in original) (brackets and citation omitted).

Thereafter, Petitioner filed in this Court a petition for a writ of *certiorari*, raising the following two issues:

1. Were Defense Exhibits 2-5 inadmissible hearsay due to the failure of authentication as a condition precedent to the business records exception to the hearsay rule?

2. Did the trial court err by admitting medical records pursuant to Maryland Rule 5-703 without an appropriate foundation for establishing the truthfulness of the records?

On September 12, 2017, this Court granted the petition. See Lamalfa v. Hearn, 456 Md.

- 18 -

55, 170 A.3d 291 (2017).

## DISCUSSION[4]

### The Parties' Contentions

Petitioner contends that the circuit court erred in admitting the four medical records into evidence pursuant to Maryland Rule 5-703. Petitioner argues that the medical records were otherwise inadmissible documents admitted for the truth of the matters asserted therein, and, as such, violated the rule against hearsay. Petitioner asserts that disclosure under Maryland Rule 5-703(b) does not mean that documents relied upon by an expert that are otherwise inadmissible are admissible into evidence or permitted to be taken to the jury room during deliberations. Stated otherwise, Petitioner maintains that disclosure is not comparable to admission for purposes of Maryland Rule 5-703(b). Instead, Petitioner contends that disclosure under Maryland Rule 5-703(b) means that documents that an expert relies upon may be discussed in the presence of the jury or, at most, the jury may review the documents during the expert's testimony. Petitioner argues that, from a public policy standpoint, if the circuit court's action is not determined to be error, then a trial court could admit into evidence any document that is otherwise inadmissible simply because an expert relies upon the document. At oral argument before this Court, Petitioner repeatedly referred to this as an "end run" around the rule against hearsay.

Petitioner asserts that, assuming *arguendo* "disclosure" means "admission," the

---

[4]Although Petitioner raised two issues in the petition for a writ of *certiorari*, on brief in this Court Petitioner raised the following single issue: "Did the trial court err by admitting medical records pursuant to Maryland Rule 5-703 where the medical records were inadmissible hearsay and no other exception to the hearsay rule applied?"

circuit court was required to make findings as to whether the medical records fulfilled the four requirements of Maryland Rule 5-703(b)—namely, whether the medical records were trustworthy, unprivileged, reasonably relied upon by Dr. Halikman in forming his opinion, and necessary to illuminate Dr. Halikman's testimony.  Petitioner does not dispute that the medical records were unprivileged and reasonably relied upon by Dr. Halikman in forming his opinion.  Petitioner maintains, however, that Respondent failed to demonstrate that the medical records were trustworthy or necessary to illuminate Dr. Halikman's testimony.  Specifically, Petitioner contends that the circuit court abused its discretion by failing to exercise its discretion to inquire into the issue of trustworthiness and the necessity to illuminate.  Petitioner acknowledges that silence on a trial court's part does not necessarily mean a failure to exercise discretion, but argues that, in this case, in admitting the records, the circuit court expressly stated only that Dr. Halikman relied upon the medical records.  According to Petitioner, this means that the circuit court did not exercise its discretion in determining whether the medical records were trustworthy and necessary to illuminate Dr. Halikman's testimony.

Finally, Petitioner contends that admission of the medical records was not harmless error, as the medical records were inadmissible hearsay, and did not satisfy the requirements of the business records exception to the rule against hearsay.  Petitioner argues that admission of the medical records allowed "the jury to place und[ue] weight on those select documents as compared to the verbal testimony and overall evidence."  Petitioner asserts that a limiting instruction would have been ineffective because the harm occurred once the medical records were admitted into evidence and permitted to be with

the jury during deliberations, "instead of simply [being] disclosed[.]"

Respondent counters that, for purposes of Maryland Rule 5-703, there is no real distinction between disclosing and admitting a document. Respondent argues that Maryland Rule 5-703 provides a trial court with discretion not only as to whether to disclose a document to the jury, but also as to how that document is to be disclosed. Respondent asserts that, by failing to request a limiting instruction as to the disclosure of the medical records, as provided for in the Rule, Petitioner waived the ability to challenge how the jury used the medical records.

Respondent contends that the medical records were admissible under, and satisfied all of the requirements of, Maryland Rule 5-703(b) because they were not privileged, were reasonably relied upon by Dr. Halikman in forming his opinion, trustworthy, and necessary to illuminate Dr. Halikman's testimony. As to trustworthiness, Respondent argues that the medical records were inherently trustworthy under this case's circumstances for several reasons, including that the medical records were prepared by the treating hospital and Petitioner's treating physicians. Respondent also asserts that the medical records were trustworthy because they were obtained from medical providers by Petitioner's counsel and provided to Respondent during discovery, and, at trial, Petitioner offered into evidence the medical bills generated by those medical providers at trial to support Petitioner's claim for damages. Respondent maintains that the medical records were necessary to illuminate both Dr. Halikman's and Dr. Koyen's testimony, as both doctors testified that they reviewed the records to formulate their opinions.

Respondent contends that Petitioner has failed to show prejudice due to the

admission of the medical records, or that admission of the medical records was manifestly wrong. Respondent argues that the record is devoid of any indication that the jury placed undue weight on the medical records, or placed any more weight on the medical records than on other evidence.

In a reply brief, Petitioner contends that Maryland Rule 5-703's plain language distinguishes between disclosure and admissibility, by use of the word "disclosed."

**Standard of Review**

In <u>Brown</u>, 409 Md. at 583-84, 976 A.2d at 310-11, this Court set forth the following applicable standard of review:

> It is often said that a trial court's ruling on the admissibility of evidence is reviewed pursuant to the abuse of discretion standard. Such rulings, it is maintained, are left to the sound discretion of the trial court and will not be reversed on appeal absent a showing of abuse of that discretion. We have stated, however, that:
>
> > Application of the abuse of discretion standard depends on whether the trial [court]'s ruling under review was based on a discretionary weighing of relevance in relation to other factors or on a pure conclusion of law. When the trial [court]'s ruling involves a weighing, we apply the more deferential standard. On the other hand, when the trial [court]'s ruling involves a legal question, we review the trial court's ruling *de novo*.
>
> Additionally, Maryland Rule 5-103 provides, in pertinent part:
>
> > (a) **Effect of erroneous ruling.** Error may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling.
>
> Thus, even if manifestly wrong, we will not disturb an evidentiary ruling by a trial court if the error was harmless. The party maintaining that error occurred has the burden of showing that the error complained of likely affected the verdict below. It is not the possibility, but the probability, of prejudice which is the object of the appellate inquiry. Courts are reluctant to

set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice.

(Cleaned up).[5] Of course, the issue of what "disclosed" means as used in Maryland Rule 5-703(b) is a legal issue that we review without deference. See Hall v. Univ. of Md. Med. Sys. Corp., 398 Md. 67, 82, 919 A.2d 1177, 1186 (2007) ("If the trial judge's ruling involves a pure legal question, we generally review the trial court's ruling *de novo*." (Cleaned up)); see also Brown, 409 Md. at 583, 976 A.2d at 311. However, the issue of whether the circuit court properly disclosed the medical records pursuant to Maryland Rule 5-703(b) raises a question of whether the circuit court abused its discretion as Maryland Rule 5-703(b) expressly provides for an exercise of "discretion[.]" Hence, in this instance, we determine whether the trial court erred or abused its discretion in disclosing, *i.e.*, admitting into evidence, the medical records under Maryland Rule 5-703(b).

**Maryland Rule 5-703**

Maryland Rule 5-703, entitled "Bases of Opinion Testimony by Experts," provides, in its entirety:

(a) In general. The facts or data in the particular case upon which an expert

---

[5]As the Court of Special Appeals has explained:

"Cleaned up" is a new parenthetical intended to simplify quotations from legal sources. *See* Jack Metzler, *Cleaning Up Quotations*, J. APP. PRAC. & PROCESS (forthcoming 2018), https://perma.cc/JZR7-P85A. Use of "cleaned up" signals that the current author has sought to improve readability by removing extraneous, non-substantive clutter (such as brackets, quotation marks, ellipses, footnote signals, internal citations or made un-bracketed changes to capitalization) without altering the substance of the quotation.

Loren J. Chassels v. Benjamin L. Krepps, ___ Md. App. ___, ___ A.3d ___, No. 954, Sept. Term, 2016, 2017 WL 5989052, *3 n.3 (Md. Ct. Spec. App. Dec. 4, 2017).

bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(b) Disclosure to jury. If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert pursuant to section (a) may, in the discretion of the court, be disclosed to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

(c) Right to challenge expert. This Rule does not limit the right of an opposing party to cross-examine an expert witness or to test the basis of the expert's opinion or inference.

This Court has remarked that "it has been the practice in this jurisdiction for some years to permit an expert to express his or her opinion upon facts in the evidence which he or she has heard or read, upon the assumption that these facts are true." Cooper v. State, 434 Md. 209, 230, 73 A.3d 1108, 1120 (2013) (cleaned up). "Maryland Rule 5-703(a) codifies this, permitting an expert to base his or her opinion on first-hand knowledge, hearsay, or a combination of the two." Id. at 230, 73 A.3d at 1120 (cleaned up). To be sure, "if evidence constitutes inadmissible hearsay, it cannot be admitted as substantive evidence, [but] Maryland Rule 5-703(b) permits a trial judge, in his or her discretion, to admit evidence as the factual basis for the expert's opinion[.]" Id. at 230, 73 A.3d at 1120 (citation omitted). However, for a document to be "admissible" under Maryland Rule 5-703(b), "four elements must be satisfied"—"[t]he document must be (1) trustworthy, (2) unprivileged, (3) reasonably relied upon by an expert in forming her or his opinion, and (4) necessary to illuminate that expert's testimony." Brown, 409 Md. at 601, 976 A.2d at 321.

In <u>Alban v. Fiels</u>, 210 Md. App. 1, 21, 61 A.3d 867, 878-79 (2013), the Court of Special Appeals elaborated on the relationship between Maryland Rule 5-703(a) and (b), explaining:

> Most certainly, an expert may give an opinion based on facts contained in reports, studies, or statements from third parties, if the underlying material is shown to be of the type reasonably relied upon by experts in the field. The focus of the language in Rule 5-703(a) that facts or data forming the basis for an expert's opinion may be relied on if of a type reasonably relied upon by experts in the particular field ordinarily relates to hearsay evidence. If such information received from others is inadmissible hearsay, it ordinarily comes in not as substantive evidence but only to explain the factual basis for the testifying expert's opinion. Regardless of why the facts or data within the meaning of Rule 5-703(a) are not admissible as substantive evidence, when they are permitted for Rule 5-703(a) purposes, they are not admitted as substantive evidence. Thus, upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.
>
> In other words, Rule 5-703(a) does not operate to admit as substantive evidence facts or data that are otherwise inadmissible. The facts or data relied upon are admissible, if at all, only to explain how the expert reached an opinion. Thus, unless inadmissible as a matter of law, inadmissible evidence, if it satisfies Rule 5-703, may be admitted, in the court's discretion, to explain the factual basis for an expert's opinion.

(Cleaned up).

In <u>Brown</u>, 409 Md. at 606, 976 A.2d at 324, this Court held that the trial court did not abuse its discretion in allowing the defendants to introduce into evidence an un-redacted report under Maryland Rule 5-703, and that, "[e]ven had it been error to admit the un-redacted report, [the plaintiff] failed to persuade us that she was prejudiced by its admission or its use at trial." In <u>Brown</u>, <u>id.</u> at 571, 976 A.2d at 303, a lead-based paint case, the plaintiff conducted a *de bene esse* deposition of the president of ARC

Environmental, an environmental expert, who identified an un-redacted report that ARC had prepared when it tested the subject property; the report identified the paint condition as intact on thirty-six of thirty-eight locations tested, and identified the other two locations as having paint that was in fair condition, meaning that 10% or less of the surface was cracked or worn. During a jury trial, the plaintiff did not offer into evidence the *de bene esse* deposition in their case-in-chief or otherwise attempt to introduce the un-redacted ARC report. See id. at 572, 976 A.2d at 304. Instead, the plaintiff called an expert in childhood lead poisoning, and the plaintiff's counsel showed the expert a version of the ARC report in which the description of the condition of the paint at the tested locations was redacted. See id. at 572, 976 A.2d at 304. The trial court permitted the plaintiff's counsel to hand the expert a redacted copy of the ARC report and stated that defense counsel could show the expert the un-redacted report on cross-examination. See id. at 574, 976 A.2d at 305.

During the defense's case, defense counsel read into evidence the transcript of the *de bene esse* deposition of the expert and defense counsel also offered into evidence the un-redacted ARC report. See id. at 576, 976 A.2d at 306. The plaintiff made an objection, which the trial court overruled. See id. at 576, 976 A.2d at 306. In closing argument, both parties referenced the un-redacted ARC report. See id. at 576-79, 976 A.2d at 306-08. In response to the question of whether there was chipping, peeling, or flaking paint at the subject property while the plaintiff lived there, the jury found in the negative. See id. at 579, 976 A.2d at 308. The trial court entered judgment in the defendants' favor; the plaintiff moved for a new trial, arguing that the trial court had erred, in relevant part, by

- 26 -

allowing the defendants to introduce the un-redacted ARC report; the trial court denied the motion; and, the plaintiff appealed. See id. at 579, 976 A.2d at 308. The Court of Special Appeals affirmed the trial court's judgment. See id. at 579-80, 976 A.2d at 308.

In this Court, the plaintiff argued that the trial court erred in allowing the defendants to offer into evidence the un-redacted ARC report, which, the plaintiff asserted, was irrelevant because it detailed the condition of the subject property five years after she had moved out; the plaintiff also maintained that she was prejudiced by the un-redacted report because it described the paint at the subject property as being intact for the most part. See id. at 600, 976 A.2d at 320-21. This Court observed that, with respect to the four elements that "must be satisfied for a document to be admissible under" Maryland Rule 5-703, the plaintiff did not argue that the un-redacted ARC report was privileged or untrustworthy, and instead contended that the report was neither relied upon by her experts nor necessary to illuminate their testimony. See id. at 601, 976 A.2d at 321. This Court disagreed with the plaintiff on both of those points. See id. at 601-02, 976 A.2d at 321-22.

We concluded that the plaintiff's contention that the un-redacted ARC report was irrelevant was waived because the plaintiff failed to request a limiting instruction under Maryland Rule 5-703, or otherwise object to the manner in which the defendants relied on the un-redacted ARC report in their closing argument. See id. at 603, 976 A.2d at 323. The record did not demonstrate that the un-redacted ARC report "was admitted for any purpose other than to illuminate the testimony of [the plaintiff]'s experts[,]" and, accordingly, the contention as to relevance took "aim only at the manner in which [the defendants] relied on the evidence." Id. at 603-04, 976 A.2d at 323. We explained:

> [The plaintiff] concedes that she never requested a limiting instruction under Rule 5-703(b) . . . ; however, she seeks to excuse her failure by claiming that [the defendant]s did not raise Rule 5-703 as a basis for admitting the Un-Redacted ARC Report. Her excuse is not convincing. Even if [the defendant]s never cited expressly the rule, the joint stipulation provided by the parties reveals that [the defendant]s argued before the trial court that the un-redacted report was admissible because [the plaintiff]'s experts relied on it. Additionally, as with any evidence that potentially could be misused, [the plaintiff] could have requested a limiting instruction under Rule 5-105 as well. Moreover, [the plaintiff] did not object when, during closing argument, [defense] counsel cited the Un-Redacted ARC Report as evidence that the paint at the Subject Property was "intact" while [the plaintiff] resided there.

Id. at 604, 976 A.2d at 323 (cleaned up). This Court also determined that the plaintiff had "fail[ed] to establish that she was prejudiced by the [defendant]s' use of the Un-Redacted ARC Report, even if the report was admitted erroneously as evidence relevant to whether peeling, chipping, or flaking paint existed at the Subject Property" when the plaintiff lived there. Id. at 605, 976 A.2d at 323. Accordingly, we held not only that the trial court did not abuse its discretion in permitting the un-redacted report to be introduced into evidence, but also that, even if it had been error, the plaintiff had failed to demonstrate "that she was prejudiced by its admission or its use at trial." Id. at 606, 976 A.2d at 324.

In Gillespie v. Gillespie, 206 Md. App. 146, 166, 160, 47 A.3d 1018, 1030, 1026 (2012), a child custody case, the Court of Special Appeals held that the trial "court was permitted to admit" under Maryland Rule 5-703 a report documenting a psychiatric evaluation of a mother because an expert witness had relied upon the report in forming her opinions. In that case, during a custody modification trial, Dr. Snyder, a psychologist appointed by the trial court to prepare a psychological evaluation of both the mother and father, testified. See id. at 160, 47 A.3d at 1026. During Dr. Snyder's testimony, the trial

court realized that Dr. Snyder had just received a report prepared by a Dr. Lish, in which Dr. Lish diagnosed the mother with bipolar disorder. See id. at 160, 47 A.3d at 1026. The trial court concluded that it was appropriate for Dr. Snyder to review the Lish report. See id. at 161, 47 A.3d at 1027. After Dr. Snyder reviewed the Lish report, the children's best interest attorney moved to have the report admitted into evidence. See id. at 159-60, 161, 47 A.3d at 1026, 1027. The mother objected, but the trial court overruled the objection and admitted the Lish report into evidence. See id. at 161, 47 A.3d at 1027. Dr. Snyder then testified about the parents' strengths and weaknesses. See id. at 161, 47 A.3d at 1027. At the conclusion of the trial, the trial court ruled that there had been a material change in circumstances, and modified physical custody by placing the children in the primary care and custody of the father; the trial court maintained joint legal custody, but provided that the father would serve as the tie-breaker in the event of an impasse. See id. at 164-65, 47 A.3d at 1029. In so ruling, the trial court explained that events had occurred "that indicate there's extreme deterioration of any mental condition that Mother suffers from." Id. at 164, 47 A.3d at 1029 (brackets omitted).

On appeal, in pertinent part, the mother contended that the trial court had erred in admitting the Lish report into evidence and relying upon it in reaching its conclusions. See id. at 165, 47 A.3d at 1029. The Court of Special Appeals disagreed, and, after quoting Maryland Rule 5-703(b), stated:

> Therefore, the [trial] court was permitted to admit the Lish Report because Dr. Snyder considered it in reaching her opinions and conclusions, even though the Lish Report contained otherwise inadmissible hearsay. The [trial] court was permitted to consider the Lish Report for the purpose of evaluating the validity and probative value of Dr. Snyder's opinion.

- 29 -

Id. at 166, 47 A.3d at 1030. The Court of Special Appeals also rejected the mother's contention that the trial court had impermissibly considered the Lish report as substantive evidence, determining that the trial "court was permitted to consider the Lish Report to evaluate the validity of Dr. Snyder's opinion, and there [was] no indication that the [trial] court considered the Lish Report as substantive evidence." Id. at 168-69, 47 A.3d at 1031. The Court of Special Appeals concluded that, "even if the [trial] court erroneously considered the Lish Report as substantive evidence, such error was harmless" because the mother "testified that she had been diagnosed with bipolar disorder, and her testimony regarding her bipolar diagnosis was properly admitted as substantive evidence." Id. at 169, 47 A.3d at 1032. As such, the Court of Special Appeals determined that the mother had failed to demonstrate prejudice. See id. at 169, 47 A.3d at 1032.

**Analysis**

Here, we hold that the circuit court did not abuse its discretion or err in admitting the medical records—the Mercy record, the Koyen record, the Chiropractic record, and the Levin record—into evidence under Maryland Rule 5-703. Specifically, we conclude that "disclosure" means that evidence is admissible under Maryland Rule 5-703(b) where the evidence satisfies the four elements set forth in Maryland Rule 5-703(b), and that such evidence may, in a trial court's discretion, be disclosed to the jury to explain the factual bases for an expert's opinion. Additionally, under the circumstances of this case, the medical records satisfied the four elements for disclosure under Maryland Rule 5-703(b) because they were trustworthy, unprivileged, reasonably relied upon by Dr. Halikman in

forming his opinions, and necessary to illuminate Dr. Halikman's testimony. And, we conclude that, even if disclosure, *i.e.*, admission, of the medical records under Maryland Rule 5-703 was error, such error was harmless, as Petitioner has failed to demonstrate that she was prejudiced by admission of the medical records or their use at trial; the record contains no indication that the jury placed undue weight on the medical records.

We begin by examining the plain language of Maryland Rule 5-703(a), which provides that, so long as facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," an expert's opinion may be based on such facts or data, regardless of whether the facts or data would "be admissible in evidence." Stated otherwise, an expert may rely on both admissible or otherwise inadmissible facts or data in forming his or her opinion, provided the facts or data are the kind that experts in that particular field would reasonably rely upon in forming opinions. Maryland Rule 5-703(b) provides that, if such facts or data are "determined to be trustworthy, necessary to illuminate testimony, and unprivileged," and are "reasonably relied upon by an expert pursuant to" Maryland Rule 5-703(a), a trial court has the discretion to order that such facts or data "be disclosed to the jury even if those facts and data are not admissible in evidence." Significantly, however, as Maryland Rule 5-703(b) provides, "[u]pon request," the trial court shall instruct the jury that such facts or data are disclosed, or admitted, not as substantive evidence, but instead "only for the purpose of evaluating the validity and probative value of the expert's opinion or inference." It is incumbent upon the party who would like that point made clear to the jury to request a limiting instruction.

- 31 -

To be sure, Maryland Rule 5-703(b) refers to the term "disclosed" to the jury, and not to the term "admitted" with respect to facts or data reasonably relied upon by a testifying expert. We are unpersuaded, however, that the plain language of Maryland Rule 5-703(b), and the use of the term "disclosed," somehow distinguishes between "disclosure" and "admission" such that "disclosed" does not mean "admitted" for purposes of the Rule where the four elements of Maryland Rule 5-703(b) are satisfied. Rather, in our view, in agreement with the Court of Special Appeals, for purposes of Maryland Rule 5-703(b), "disclosure" of facts or data reasonably relied upon by an expert witness means "admission" of the information at issue provided that the four elements of the Rule are fulfilled.

Notably, Maryland Rule 5-703 does not define the term "disclosed" or otherwise limit the term to something short of admission into evidence. Indeed, contrary to Petitioner's contention, nothing in Maryland Rule 5-703 purports to limit disclosure to either allowing an expert to testify about the facts or data that the expert relied upon or permitting the jury to review the facts or data only during the expert's testimony. Presumably, had the term "disclosed" been intended to have such a meaning where only certain narrow modes of disclosure were permissible, Maryland Rule 5-703 would have so specified. We discern no appreciable difference between disclosure and admission of facts or data under Maryland Rule 5-703 because, as the Court of Special Appeals, with the Honorable Deborah S. Eyler writing for the Court, aptly stated, "to be able to use the writing [containing the facts or data] to assess the credit, if any, to be accorded the opinion of the expert witness who relied upon it, the fact finder must be able to read the document,

- 32 -

not just glance at it in passing." Lamalfa, 233 Md. App. at 155, 163 A.3d at 213. In sum, nothing in the plain language of Maryland Rule 5-703(b)—*i.e*., the use of the word "disclosed"—prohibits the documents at issue from being given to the jury just as if the documents had been admitted into evidence.

Additionally, we observe that, in applying Maryland Rule 5-703, both this Court and the Court of Special Appeals have interpreted disclosure to mean admission. See, e.g., Cooper, 434 Md. at 230, 73 A.3d at 1120 ("[I]f evidence constitutes inadmissible hearsay, it cannot be **admitted** as substantive evidence, [but] Maryland Rule 5-703(b) permits a trial judge, in his or her discretion, to **admit** evidence as the factual basis for the expert's opinion[.]" (Emphasis added) (citation omitted)); Brown, 409 Md. at 601, 976 A.2d at 321 ("[F]our elements must be satisfied for a document to be **admissible** under" Maryland Rule 5-703. (Emphasis added)); Alban, 210 Md. App. at 21, 61 A.3d at 879 ("Thus, unless inadmissible as a matter of law, inadmissible evidence, if it satisfies Rule 5-703, may be **admitted**, in the court's discretion, to explain the factual basis for an expert's opinion." (Emphasis added)); Gillespie, 206 Md. App. at 166, 47 A.3d at 1030 ("[T]he [trial] court was permitted to **admit** the Lish Report because Dr. Snyder considered it in reaching her opinions and conclusions, even though the Lish Report contained otherwise inadmissible hearsay." (Emphasis added)).

We readily acknowledge that in none of these cases did this Court or the Court of Special Appeals expressly address the meaning of "disclosed," or whether "disclosed" means "admitted" for purposes of Maryland Rule 5-703(b). However, it is evident that both this Court and the Court of Special Appeals have treated disclosure as admission for

- 33 -

purposes of Maryland Rule 5-703(b) if the four elements are satisfied. In both <u>Brown</u> and <u>Gillespie</u>, the trial court clearly admitted into evidence the contested document. <u>See</u> <u>Brown</u>, 409 Md. at 576, 976 A.2d at 306 (Defense counsel "offered into evidence the Un-Redacted ARC Report . . . . [The plaintiff] objected when [the defendant]s introduced the Un-Redacted ARC Report into evidence, but her objection was overruled."); <u>Gillespie</u>, 206 Md. App. at 159-60, 161, 47 A.3d at 1026, 1027 (The children's best interest attorney "moved to have the Lish Report . . . admitted into evidence. Mother objected to the admission of the Lish Report[.] . . . Thereafter, the court admitted the Lish Report . . . into evidence."). In other words, in each case, the contested document was admitted into evidence, not simply shown to a jury or discussed by the expert—*i.e.*, the procedures that Petitioner contends constitute "disclosure," but fall short of "admission," for purposes of Maryland Rule 5-703(b). And, significantly, in analyzing and applying Maryland Rule 5-703(b), both this Court and the Court of Special Appeals referred to "admission," and variations thereof, rather than "disclosure." <u>See Brown</u>, 409 Md. at 601, 603, 604, 976 A.2d at 321, 322, 323; <u>Gillespie</u>, 206 Md. App. at 166, 169, 47 A.3d at 1030, 1031.

At oral argument, in response to a question as to whether this Court might look to Maryland Rule 5-703's counterpart in the Federal Rules of Evidence for guidance concerning "inadmissibility," Respondent's counsel stated that the relevant Federal Rule of Evidence was distinguishable and "stricter" than Maryland Rule 5-703(b) with respect to disclosure of facts and data relied upon by an expert. Upon review of Federal Rule of Evidence 703—the federal counterpart to Maryland Rule 5-703—we conclude that Federal Rule of Evidence 703 varies from the Maryland Rules on this point, and sets forth a

different standard for disclosure of facts and data relied upon by an expert. As such,

Federal Rule of Evidence 703 does not provide guidance with respect to the meaning or

requirements of "disclosed" for purposes of Maryland Rule 5-703(b). Federal Rule of

Evidence 703, concerning the bases of an expert's opinion testimony, provides, in full:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Advisory Committee Notes concerning the 2000 amendments to Federal Rule of Evidence

703 elaborate:

> Rule 703 has been amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted. . . .
>
> When information is reasonably relied upon by an expert and yet is admissible only for the purpose of assisting the jury in evaluating an expert's opinion, a trial court applying this Rule must consider the information's probative value in assisting the jury to weigh the expert's opinion on the one hand, and the risk of prejudice resulting from the jury's potential misuse of the information for substantive purposes on the other. The information may be disclosed to the jury, upon objection, only if the trial court finds that the probative value of the information in assisting the jury to evaluate the expert's opinion substantially outweighs its prejudicial effect. If the otherwise inadmissible information is admitted under this balancing test, the trial judge must give a limiting instruction upon request, informing the jury that the underlying information must not be used for substantive purposes. *See* Rule 105. In determining the appropriate course, the trial court should consider the probable effectiveness or lack of effectiveness of a limiting instruction under the particular circumstances.

Federal Rule of Evidence 703 requires that, where the proponent of an expert's opinion seeks to disclose the otherwise inadmissible underlying facts or data, not only must the facts and data be of the type that experts in that particular field would reasonably rely upon, but also, the trial court must engage in a balancing test, weighing the probative value of the facts and data in helping the jury evaluate the expert's opinion against the prejudicial effect of the facts and data. Only if the probative value "substantially outweighs" the prejudicial effect may the trial court permit disclosure of the facts and data to the jury. By contrast, nothing in Maryland Rule 5-703(b) or Maryland case law requires a trial court to weigh the probative value of the facts and data underlying an expert's opinion against their prejudicial effect before permitting disclosure to a jury. Instead, as we explained in Brown, 409 Md. at 601, 976 A.2d at 321, "four elements must be satisfied for a document to be admissible under" Maryland Rule 5-703—"[t]he document must be (1) trustworthy, (2) unprivileged, (3) reasonably relied upon by an expert in forming his or her opinion, and (4) necessary to illuminate that expert's testimony." Simply put, the requirements for disclosure under Federal Rule of Evidence 703 are distinct from the requirements for disclosure under Maryland Rule 5-703, and Federal Rule of Evidence 703 does not illuminate the meaning of or requirements for disclosure under Maryland Rule 5-703.

In short, we conclude that disclosure means admission for purposes of Maryland Rule 5-703 where the four elements of Maryland Rule 5-703(b) are satisfied. It is obvious, however, that what makes the difference with respect to admission of facts or data reasonably relied upon by a testifying expert under Maryland Rule 5-703(b), as opposed to the admission of evidence generally, is the limiting instruction provided for in Maryland

Rule 5-703(b)—namely, that facts or data reasonably relied upon by a testifying expert are not admitted as substantive evidence, unless otherwise admissible for their substance, but rather are to be used "only for the purpose of evaluating the validity and probative value of the expert's opinion or inference." It cannot be overemphasized that Maryland Rule 5-703(b) expressly provides that, upon request, the trial court shall instruct the jury that facts or data reasonably relied upon by a testifying expert are used to assess the validity and probative value of the expert's opinion, not as substantive evidence.

At oral argument, Petitioner's counsel readily admitted that he did not request that the circuit court give the limiting instruction provided for in Maryland Rule 5-703(b). Oddly, Petitioner's counsel contended that the limiting instruction provided for in Maryland Rule 5-703(b) would "work[]" only if the documents were "merely disclosed[,]" and not physically provided to the jury during deliberations. Petitioner's counsel essentially argued that, once documents containing facts or data reasonably relied upon by a testifying expert go to the jury room, a limiting instruction would be of no value. We disagree. Petitioner's counsel's contention—that a limiting instruction is useless after documents are physically provided to a jury during deliberations—is antithetical to the purpose of limiting instructions and contradicts the manner in which trial courts traditionally use such instructions. Indeed, limiting instructions are routinely used where evidence has been admitted for one purpose, but is not to be considered for another purpose. See, e.g., Md. R. 5-105 ("Where evidence is admitted that is admissible as to only party or for one purpose but not admissible as to another party or for another purpose, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury

accordingly."); <u>Balt. Gas and Elec. Co. v. Flippo</u>, 112 Md. App. 75, 105-06, 684 A.2d 456, 471 (1996), <u>aff'd</u>, 348 Md. 680, 705 A.2d 1144 (1998) ("It should be obvious that, if the admissibility of a drawing is within the discretion of the trial judge, it is equally within the judge's discretion to admit it for a limited purpose only. . . . [W]e certainly perceive no abuse of discretion in the limiting instruction."). In short, we reject the premise that incurable harm occurs once documents containing facts or data reasonably relied upon by an expert are admitted into evidence and physically provided to the jury during deliberations, and that a limiting instruction is ineffective if requested under those circumstances. Limiting instructions are tailored to explain to the jury how to consider evidence that is admitted. And, significantly, a jury is presumed to follow a trial court's instruction. <u>See</u> <u>Collins v. Nat'l R.R. Passenger Corp.</u>, 417 Md. 217, 252, 9 A.3d 56, 77 (2010) ("Jurors are presumed to have followed the instructions provided to them by the court, our legal system necessarily proceeds upon that presumption." (Cleaned up)).

From our perspective, although we have addressed the significant issue of whether under Maryland Rule 5-703(b) disclosure means admission if the four elements of the Rule are satisfied, Petitioner's failure to request a limiting instruction at any point with respect to the medical records—either at the time of their admission, at the close of the evidence, or during Respondent's counsel's closing argument—constitutes a waiver of any issue as to the weight that the jury may have accorded the medical records. <u>See</u> <u>Brown</u>, 409 Md. at 603, 976 A.2d at 323 (This Court concluded that the plaintiff's argument as to the relevance of the contested document was waived because the plaintiff "did not request a limiting instruction under Maryland Rule 5-703 and did not object to the manner in which

- 38 -

[the defendants] relied on the [document] in their closing argument."). Stated otherwise, Petitioner had the opportunity to request a limiting instruction so that the jury would be instructed to consider the medical records only for the purpose of evaluating the validity and probative value of Dr. Halikman's opinion, and not as substantive evidence, but failed to do so. Thus, Petitioner waived any contention that the jury may have considered the medical records as substantive evidence.

We are unpersuaded by Petitioner's contention that holding that disclosure means admission under Maryland Rule 5-703 works an "end run" around the rule against hearsay and permits a trial court to admit into evidence any document that is otherwise inadmissible simply because an expert witness relies upon it. Our holding—that disclosure means admission for purposes of Maryland Rule 5-703 where evidence satisfies the four elements of Maryland Rule 5-703(b)—does not circumvent the rule against hearsay, or otherwise open the floodgates for trial courts to admit into evidence any and all documents containing facts or data relied upon by a testifying expert. Importantly, Maryland Rule 5-703(b) has built-in safeguards in the form of four requirements that must be satisfied for a trial court to admit facts or data relied upon by a testifying expert—namely, "[t]he document must be (1) trustworthy, (2) unprivileged, (3) reasonably relied upon by an expert in forming her or his opinion, and (4) necessary to illuminate that expert's testimony." Brown, 409 Md. at 601, 976 A.2d at 321. These four requirements serve a gatekeeping function with respect to disclosure to a jury of facts or data relied upon by an expert witness pursuant to Maryland Rule 5-703. Simply put, facts or data relied upon by a testifying expert are not automatically disclosable to a jury under Maryland Rule 5-703 merely because the

testifying expert relies upon them; rather, the facts or data must satisfy the four elements set forth in Maryland Rule 5-703(b) to be disclosed to the jury.

Here, with respect to those four elements, we determine that the record demonstrates that the medical records in this case satisfied the four elements for disclosure under Maryland Rule 5-703(b) because they were trustworthy, unprivileged, reasonably relied upon by Dr. Halikman in forming his opinions, and necessary to illuminate Dr. Halikman's testimony.[6]  As an initial matter, we note that, although it would have been the better practice for the circuit court to announce that the four elements set forth in Maryland Rule 5-703(b) had been satisfied or to make findings with respect to the four elements, the lack of such an announcement or findings, in this case, does not preclude a determination that the prerequisites for disclosure of the medical records were satisfied.  Although Maryland Rule 5-703(b) provides that a trial court must "determine[]" that the four elements are fulfilled before, in its discretion, permitting facts or data reasonably relied upon by a testifying expert to disclosed to the jury, Maryland Rule 5-703(b) does not expressly require that the trial court announce its determinations or findings on the record.  Nevertheless, a trial court should be extremely cautious when permitting disclosure under Maryland Rule 5-703(b), and the trial court should take care to make known its

---

[6]As to records or reports being reasonably relied upon by the expert witness, it goes without saying that only the portion of the underlying record or report on which the expert has testified that he or she relied upon would be admissible.  Stated otherwise, to the extent that an expert testifies to having relied on only a portion or segment of a record or report, the trial court, in its discretion, after determining the existence of the other relevant factors set forth in Maryland Rule 5-703(b), should admit only the portion of the record or report reasonably relied upon by the expert witness.

determinations with respect to the four elements of Maryland Rule 5-703(b), *i.e.*, the trial court should determine that the four elements are satisfied before allowing disclosure.

The circuit court is presumed to know and properly apply the law. See Aventis Pasteur, Inc. v. Skevofilax, 396 Md. 405, 426, 914 A.2d 113, 125 (2007) ("It is a well-established principle that trial judges are presumed to know the law and apply it properly." (Cleaned up)). In this case, just because the circuit court expressly mentioned only one of the four elements of Maryland Rule 5-703(b)—reliance by Dr. Halikman in reaching his opinion—does not mean that the circuit court failed to consider whether the other three elements were satisfied. See id. at 426, 914 A.2d at 125-26 ("We presume judges to know the law and apply it, even in the absence of a verbal indication of having considered it. . . . [T]rial judges are not obliged to spell out in words every thought and step of logic." (Cleaned up)). In other words, the circuit court's correct statement concerning one of the elements for disclosure under Maryland Rule 5-703 does not necessarily lead to the conclusion that the circuit court somehow misapplied the law with respect to the other three elements. Indeed, on brief, Petitioner acknowledges that silence on the part of the circuit court does not necessarily or automatically mean that the circuit court failed to exercise its discretion to consider and determine whether the four elements for disclosure under Maryland Rule 5-703 had been met. Specifically, Petitioner states that, "[o]rdinarily, where a judge is silent on applying discretion to the admission of evidence, the appellate court will not necessarily interpret the silence as a failure to apply discretion." (Citation omitted). Although determining on-the-record that the four factors were satisfied may have been the better practice, it is clear that the circuit court did not abuse its discretion by failing

to expressly announce that it had considered and determined the other three elements before ruling. And, the circuit court's failure to make such an announcement does not preclude the conclusion that the requirements for disclosure under Maryland Rule 5-703(b) were met.[7]

Under the distinctive circumstances of this case, it is clear, based on the record, that the medical records satisfied all four elements of Maryland Rule 5-703(b). Here, as stated above, Petitioner does not dispute that the medical records were unprivileged and reasonably relied upon by Dr. Halikman in forming his opinion, but contends that Respondent failed, and the circuit court made no inquiry, to demonstrate that the medical records were trustworthy or necessary to illuminate Dr. Halikman's testimony. Thus, in

---

[7]As stated, Maryland Rule 5-703(b) requires only that it be "determined" by the trial court that the four elements of Maryland Rule 5-703(b) are satisfied before the trial court may, in its discretion, disclose to the jury facts or data reasonably relied upon by an expert witness. Maryland Rule 5-703(b)—unlike other Rules—does not require that the trial court announce on the record its determinations. See, e.g., Md. R. 4-246(b) ("The court may not accept the waiver [of the right to a jury trial] until, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, **the court determines and announces on the record** that the waiver is made knowingly and voluntarily." (Emphasis added)); Md. R. 15-203(a) ("If **the court summarily finds and announces on the record** that direct contempt has been committed, the court may defer imposition of sanctions until the conclusion of the proceeding during which the contempt was committed." (Emphasis added)).

In our view, the best practice under Maryland Rule 5-703(b) is for a trial court to explain on the record that it has considered each of the four elements set forth in the Rule and determined whether they are satisfied. Because Maryland Rule 5-703(b) does not currently require an express announcement by the trial court that the four elements of Maryland Rule 5-703(b) have been satisfied, we refer the issue of whether Maryland Rule 5-703(b) should require an announcement to the Standing Committee on Rules of Practice and Procedure for consideration.

this case, two of the four elements are not in dispute. We agree that the medical records were unprivileged and reasonably relied upon by Dr. Halikman in forming his opinions, and we examine only the elements of trustworthiness and necessity to illuminate Dr. Halikman's testimony. The record demonstrates that the medical records were trustworthy—the medical records were prepared by the treating hospital and Petitioner's own treating physicians post-accident. And, Respondent indicates on brief that Petitioner's counsel provided the medical records to Respondent's counsel before trial. Also, the medical bills generated by the providers who authored the medical records were offered into evidence by Petitioner to support her claim for damages.[8]

Likewise, the record demonstrates that the medical records were necessary to illuminate Dr. Halikman's testimony. Petitioner filed the complaint in 2014, three years after the accident; during the interim, Petitioner sought medical treatment from the four providers whose records are at issue for a variety of alleged medical conditions. Dr. Halikman testified that he relied upon the medical records to form his opinion—that the

---

[8]When medical bills are introduced into evidence to support a plaintiff's claim for damages, the trial court necessarily makes a finding, either implicitly or explicitly, that the medical bills reflect amounts that are fair and reasonable. See, e.g., Kujawa v. Balt. Transit Co., 224 Md. 195, 208, 167 A.2d 96, 102 (1961) ("In excluding [] other medical bills, the [trial] court did not require the personal appearance of the billing doctors. The only requirement was that the plaintiffs should 'have evidence' that the charges were reasonable. The medical bills, absent a showing of reasonableness, were properly excluded. Evidence of the amount or payment of medical bills does not establish the reasonable value of the services for which the bills were rendered or justify recovery therefor." (Citations omitted)); Desua v. Yokim, 137 Md. App. 138,143, 768 A.2d 56, 58-59 (2001) ("In order for the amounts paid or incurred for medical care to be admissible as evidence of special damages, there ordinarily must be evidence that the amounts are fair and reasonable." (Citation omitted)).

injury to Petitioner's right shoulder did not result from the car accident and that any injury to the abdomen would have been evident within months after the accident, but was not—and, given the nature of Petitioner's complaints and the time period over which Petitioner sought medical treatment, the medical records were necessary to illuminate Dr. Halikman's testimony and to aid the jury in understanding the basis for Dr. Halikman's opinion. In short, all four elements for disclosure under Maryland Rule 5-703(b) were fulfilled, and the circuit court did not abuse its discretion or err in admitting the medical records into evidence. We reiterate that, under the circumstances of this case, there was sufficient information in the record that the medical records satisfied the four elements of Maryland Rule 5-703(b). In general, however, a trial court should make known its determination with respect to the four elements of Maryland Rule 5-703(b), as there may be instances in which, even though a trial court is presumed to know and properly apply the law, the record will not reflect sufficient information from which an appellate court may conclude that all four elements have been satisfied.

Because there was no error on the circuit court's part, and because, by failing to request a limiting instruction, Petitioner waived any issue as to the weight the jury may have accorded the medical records, we need not examine whether there was harmless error. Nonetheless, we conclude that, even if admission of the medical records was error, such error was harmless. Petitioner has failed to demonstrate prejudice from admission of the medical records, or to otherwise show that the jury placed undue weight on the medical records. The record is completely devoid of any indication that the jury placed undue weight on the medical records, or even that the jury placed more weight on the medical

records than on the other evidence adduced at trial.  Cf. Gillespie, 206 Md. App. at 169, 47 A.3d at 1031-32 ("[A]ssuming *arguendo* the [trial] court erred in admitting the Lish Report into evidence as substantive evidence, the error was harmless. . . . The burden is on the complaining party to show prejudice as well as error.  The complaining party must demonstrate that the prejudice was likely or substantial."  (Cleaned up)).

In sum, we hold that the circuit court properly admitted the medical records under Maryland Rule 5-703.  This is so because "disclosed" means "admitted" under Maryland Rule 5-703(b) if the evidence at issue satisfies the four elements set forth in Maryland Rule 5-703(b), and such evidence may, in a trial court's discretion, be disclosed to the jury to explain the factual bases for an expert's opinion.  In this case, the medical records satisfied the four elements for disclosure under Maryland Rule 5-703(b) because they were trustworthy, unprivileged, reasonably relied upon by Dr. Halikman in forming his opinions, and necessary to illuminate Dr. Halikman's testimony.[9]

Accordingly, we affirm the judgment of the Court of Special Appeals.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  PETITIONER TO PAY COSTS.**

---

[9]Because we hold that the medical records were properly admitted into evidence under Maryland Rule 5-703(b), we do not address whether the medical records were admissible under an exception to the rule against hearsay as Respondent contends—namely, that the medical records were otherwise admissible as statements of a then existing mental, emotional, or physical condition pursuant to Maryland Rule 5-803(b)(3), as statements for purposes of medical diagnosis or treatment pursuant to Maryland Rule 5-803(b)(4), as business records under Maryland Rule 5-803(b)(6), or under the catchall or residual exception of Maryland Rule 5-803(b)(24). Simply put, whether the medical records were admissible pursuant to an exception to the rule against hearsay would have no effect on our holding that the medical records were properly admitted pursuant to Maryland Rule 5-703(b).